IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 8, 2016

**DAVID CHARDWICK WOOTEN v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2010D3322      Cheryl A. Blackburn, Judge**
_____

**No. M2015-01141-CCA-R3-PC – Filed November 28, 2016**
_____

Petitioner, David Chardwick Wooten, appeals the dismissal of his petition for post-conviction relief in which he alleged ineffective assistance of counsel at trial. More specifically he contends that trial counsel failed to present favorable evidence and witnesses on his behalf at trial. After a thorough review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR. and CAMILLE R. MCMULLEN, JJ., joined.

Manuel B. Russ, Nashville, Tennessee, for the [petitioner], David Chardwick Wooten.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Senior Counsel, Glenn R. Funk, District Attorney General; and Chad Butler and Brian Holmgren, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

*Background*

Petitioner was convicted of two counts of aggravated sexual battery, a Class B felony, and was sentenced to ten years for each conviction to be served concurrently at 100%. This Court affirmed the convictions and sentence. *State v. David Wooten*, No. M2012-00366-CCA-R3-CD, 2013 WL 4007784 (Tenn. Crim. App. Aug. 6, 2013), *perm. app. denied* (Tenn. Dec. 11, 2013).

The following facts were set forth by this Court on direct appeal:

In November 2010, the Davidson County Grand Jury indicted the [petitioner] for four counts of aggravated sexual battery. According to the indictment, the offenses occurred between July 1, 2004, and November 30, 2004. The victim of the offenses was the [petitioner]'s daughter, who was born [in 1994].

At the [petitioner]'s October 2011 trial, the then seventeen-year-old victim testified that she currently lived with her fourteen-year-old brother, Z.W., and her mother, S.W. In 2004, the victim's parents were married but separated for three or four months. The victim was about ten years old and in the fifth grade, and she and Z.W. spent Wednesdays and every other weekend with the [petitioner] at his Preston Run apartment in Hendersonville. The victim and Z.W. slept in the [petitioner]'s bed with him, or sometimes the victim slept in the bed with the [petitioner] while Z.W. slept on the floor. When the victim and her brother both slept in the bed with the [petitioner], the victim or the [petitioner] slept in the middle.

The victim testified that she would awake with the [petitioner]'s hands "down [her] pants." She explained that the [petitioner]'s hands would "go up [her] shorts, like the bottom" and be inside her panties. She stated that the [petitioner] touched the inside of her labia but outside her vagina and that he moved his fingers "[b]ack and forth like up and down." The victim said she was scared and would "just try and move and roll over." When she rolled over, the [petitioner] stopped touching her. The State asked her if the [petitioner] ever touched her when Z.W. was not in the bed. The victim said yes and stated, "I just remember that there was enough room where I could roll over. And when there was all three of us, it was really squeezed together. We were all tight." One time, the [petitioner] got out of bed after he touched her and washed his hands. The State asked the victim if she knew how many times the [petitioner] touched her, and the victim answered, "No, I just knew it happened enough where I would want to wear pants." She said that when she wore pajama pants or sweat pants, the [petitioner] would not touch her. During the abuse, the victim never said anything to the [petitioner], and he never said anything to her. She said that her parents reconciled and that "then there was a long period of time, and then it was one last time and it stopped." Sometime after her parents got back together, the [petitioner] told the victim that she should not say anything about the abuse and that he would try to get her a cellular telephone for

2

Christmas. The victim said she got the telephone for Christmas when she was eleven years old and in the sixth grade.

The victim testified that about two years before trial, the [petitioner] spanked her "really hard." The victim was very upset; telephoned her friend, Brittany Kuntz; and went to Kuntz's house for a while. There, she told Kuntz and Kuntz's mother, Samantha Searcy, about the touching. The victim said she revealed the abuse to them because it had been "eating away" at her and because

> I was just tired of the way everything was. And I got in trouble for anything and everything, and it wasn't like normal punishment. It wasn't like you're grounded for a week. It was let me throw my cell phone at your knee, let me hit you and push you, spank you as hard as I can.

After the victim revealed the abuse, Searcy telephoned S.W., and S.W. arrived at Searcy's home. Searcy told S.W. about the [petitioner]'s touching the victim, and S.W. left to talk with the [petitioner]. Later that day, the victim talked with her parents at home. S.W. thought the victim was lying. That night, the victim talked with S.W. privately and told S.W. "more in detail" about what had happened with the [petitioner]. S.W. started to believe the victim. The next morning, S.W. left for a business trip while the victim and Z.W. stayed home with the [petitioner]. The victim said she was not afraid to stay with the [petitioner] because he had not sexually abused her for two or three years.

The victim testified that while S.W. was gone, the [petitioner] woke her one night and told her that she needed to telephone S.W. and tell S.W. that she had lied about the abuse. Otherwise, the [petitioner] and S.W. were going to "split up," and the victim "was going to be the cause of it all." The victim did as the [petitioner] instructed. The victim said that after she got off the telephone with her mother, the [petitioner] told her that "he felt sorry for everything that had happened and ever since it happened he felt like a horrible person and he felt like going to hell." The victim said her family did not discuss the abuse again until January 2010. At that time, the victim revealed to S.W. that the [petitioner] had made her call S.W. and claim that she lied about the touching. She said that she told S.W. she had been truthful about the sexual abuse and that S.W. "immediately started crying and knew exactly that [she] was telling

3

the truth." Later that day, S.W. confronted the [petitioner]. The next night, the victim's parents told her that they were going to divorce, that it was not her fault, and that the [petitioner] had "confessed everything" to S.W. One or two weeks later, the [petitioner] moved out of their home. The victim had wanted to keep a relationship with the [petitioner] and continued to see him. However, at some point, the victim stopped visiting him because he said something rude to her and "was just really mean like he used to be." About two weeks later, a no contact order was entered, which prevented the victim and her brother from visiting the [petitioner]. At the time of trial, the victim had not spoken with him since July or August 2010.

On cross-examination, the victim denied going through a "lying stage" when she was thirteen years old. She acknowledged that a woman named Joanne interviewed her about the abuse and that she told Joanne the [petitioner] touched her four or five times. She said that Joanne "wanted me to give her a number" and that "I didn't want to be like, oh, it happened nine times and that be an exaggeration." She denied fighting with her brother about who would get to sleep in the middle of the [petitioner]'s bed and acknowledged that she told her mother the [petitioner] penetrated her. On the day in January 2010 when the victim reaffirmed the abuse to her mother, the victim's parents had been fighting. The victim acknowledged that she had felt "badly" for her mother, but she denied reaffirming the abuse in order to make her mother feel better. She said that the [petitioner] was the primary disciplinarian in the family and acknowledged that he was more strict than her mother. She also acknowledged that a spanking led to her revelation about the sexual abuse and that she thought she was too old to be spanked. The victim said the [petitioner] never did anything inappropriate to her in her bedroom.

On redirect examination, the victim acknowledged that the [petitioner] did not sexually abuse her every time she visited his apartment in 2004. She said she told her mother that the [petitioner] penetrated her because she "didn't really understand what all the words meant." Although the victim had told her mother that the [petitioner] "fingered" her, she was incorrect; the [petitioner] did not put his fingers inside her vagina. The victim said that she did not tell anyone about the abuse earlier because she was scared, and she denied making up the allegations to punish the [petitioner] for disciplining her. On recross examination, the victim

4

acknowledged that her brother got a cellular telephone when he was twelve years old.

John Barker, a licensed marriage, family, and adolescent therapist, testified that he began counseling S.W. in June 2010. On June 9, 2010, Barker met with S.W. for the first time. He met with her again on June 16 and 24. Based on information from their meetings, Barker contacted the Department of Children's Services (DCS) to report that S.W.'s daughter had been abused by the child's father. On June 26, Barker met with the victim to inform her that he had filed the report. He also questioned the victim about the abuse. The victim told Barker that the [petitioner] touched her under her clothing but that he did not penetrate her. Barker said the victim "confirmed that it happened five times."

On cross-examination, Barker testified that when he first met with S.W., she said she was separated from her husband because her husband had abused their daughter. Barker stated that during his second meeting with S.W., he "directed" her to "elaborate on what that meant." S.W. told Barker that her husband had sexually abused their daughter and that the abuse had not been reported to authorities.

S.W., the victim's mother and the [petitioner]'s ex-wife, testified that she met the [petitioner] when she was fourteen years old. They were together for twenty years and married for sixteen years. They had two children, and S.W. divorced him in June 2011. In the summer of 2004, S.W. and the [petitioner] were living in Hendersonville but decided to separate. During that time, the [petitioner] lived in Preston Run Apartments and saw their children on Wednesdays and every other weekend. Their daughter, the victim, was ten years old, and their son, Z.W., was seven years old. S.W. and the [petitioner] reconciled about Thanksgiving 2004. After they reconciled, the [petitioner] wanted to buy the victim a cellular telephone. S.W. thought the idea was "ridiculous" because the victim was only in the sixth grade and did not need a phone. S.W. said the [petitioner] "kept pushing and pushing," so they got the victim a cellular telephone for Christmas.

S.W. testified that one day in 2008 when the victim was thirteen years old, S.W. was at work and received a telephone call from the victim. The victim was very upset and crying and told S.W. that the [petitioner] had spanked her "really, really bad." S.W. said that the [petitioner]'s spanking the victim was not unusual and that he could be "very violent

toward her, very angry at her all the time." The victim wanted S.W. to come home, so S.W. decided to leave work. On her way home, she received a telephone call from Samantha Searcy and went to Searcy's house. The victim was there, and S.W. learned that the [petitioner] had molested the victim while S.W. and the [petitioner] were separated in 2004. S.W. drove home and spoke with the [petitioner], and he denied the victim's allegations. S .W. and the [petitioner] went to the Searcy home to speak with the victim. S.W. said that Searcy was "threatening to call DCS" and that S.W. and the [petitioner] "were really worried about that. " Therefore, they decided to take the victim home and "settle it as a family together by ourselves." S.W. said that she did not believe the victim because she and the [petitioner] had been together their whole lives and because she could not imagine the [petitioner]'s "doing anything like that."

S.W. testified that when the three of them got home, she was the only one talking and that the discussion was "tabled because nobody could really figure out what had happened." Later that day, the victim spoke with S.W. in S.W.'s bathroom. The victim told S.W. that "it really happened" and that the [petitioner] "washed his hands after he did it." S.W. stated that while the victim was talking with her, the [petitioner] was outside the bathroom door, pacing back and forth. The victim was afraid that the [petitioner] was going to come into the bathroom, so she would not say anything else. The next day, S.W. left for a business trip. She said she was not afraid to leave the victim with the [petitioner] because she was in shock and "just kind of wanted to shove it under the carpet." While S.W. was away, she telephoned the [petitioner] and told him that she could not stop thinking about the victim's allegations. She said she also told him that if the victim's allegations were true, she and the [petitioner] were going to divorce, and he was never going to see their children again. S.W. said the [petitioner] "freaked out" and hung up the telephone. About an hour later, he called her and told her that the victim had something to tell her. The victim got on the phone and told S.W. that she had made up the allegations. S.W. asked the victim if she was sure, and the victim stated, "[N]o, Mom, I made it up."

S.W. testified that in 2010, when the victim was fifteen years old, she went on another business trip. When she returned home, the [petitioner] screamed at her and accused her of cheating on him. S.W. told the [petitioner] that he had an anger problem and that they were going to divorce if he did not get help. S.W. said that she and the victim went to

6

a "smoothie shop" to talk and that the victim wanted to know if S.W. and the [petitioner] were going to divorce. S.W. said the victim told her, "I cannot go through that again because when you were separated is when that happened to me." The victim told S.W. that the [petitioner] had made her lie about the allegations being untrue.

S.W. testified that she and the victim went home and that she confronted the [petitioner]. The [petitioner] never claimed the victim was lying. He wanted to know what S.W. was going to do and wanted to know if she was going to call the police. Later, he confessed to touching the victim, and he and S.W. decided to divorce. S.W. said the [petitioner] told her that he had been "laying there in the bed," that "something came over [him]," and that he could not stop himself. The [petitioner] touched the victim under her underwear. S.W. told the [petitioner] that the victim had claimed he washed his hands afterward. She said the [petitioner] stated that "that was the first time that he did it." The [petitioner] told S.W. that he woke up touching the victim, "freaked out," and washed his hands because he "felt really dirty and he realized what he had done." The [petitioner] admitted to S.W. that he touched the victim more than once.

S.W. testified that she and the [petitioner] talked with the victim. The [petitioner] told the victim that he and S.W. were going to divorce and that it was not the victim's fault. S.W. and the [petitioner] decided that he would not date anyone with children, that he would get counseling, and that they would not contact DCS or the police. The [petitioner] moved out of their home in January 2010, and S.W. filed for divorce in March 2010. S.W. started having trouble sleeping and eating, so she decided to see a counselor. She did not know that the counselor was required to report the abuse to DCS. Although S.W. told her counselor about the abuse, she never heard from DCS or the police. In August 2010, she contacted the police herself. She said she never tried to extort money from the [petitioner] and was not jealous about his dating other women. The [petitioner] had breached their agreement by seeing women with children and by not receiving counseling. At some point, S.W. and the police made a controlled call to the [petitioner], and he made admissions to her. Although S.W. had allowed her children to visit the [petitioner], the victim decided to stop seeing him. The State closed its direct examination of S.W. by asking her if she ever noticed any unusual behavior by the victim while she and the [petitioner] were separated in 2004. S.W. recalled that one time when the victim was preparing to visit

the [petitioner], the victim had a "major outburst" because her pajama pants were not clean. S.W. said the victim was "screaming and crying and saying that she wanted her pajama bottoms."

On cross-examination, S.W. testified that the victim was "rebelling a little" when the victim was thirteen years old. She said that the victim would lie sometimes when the victim got into trouble but that "I wouldn't say she was a liar." S.W. did not remember telling anyone that the victim was going through a "lying phase" when the victim was thirteen. Defense counsel asked S.W. if the victim was going through a lying phase at that age, and S.W. answered, "I don't know." S.W. acknowledged that she did not believe the victim's allegations at first but said that she had some doubts about the [petitioner]'s denying the abuse. The [petitioner] never told S.W. that he touched the victim's vaginal area only to apply medication when she was a baby. In 2008, the victim told S.W. that the [petitioner] had penetrated her. S.W. said that the victim did not understand the meaning of "penetrate" and that she explained it to the victim. The victim then said that the [petitioner] had not penetrated her. S.W. acknowledged telling someone at DCS in 2010 that the [petitioner] had penetrated the victim. She said she was referring to what the victim revealed to her in 2008. S.W. also acknowledged telling someone at DCS that the victim had claimed the [petitioner] always made her sleep between him and Z.W. S.W. stated that when the victim telephoned in 2008 and said that she had lied about the abuse, S.W. wanted to believe the victim was lying and "chose to do that." She said the victim and the [petitioner] used to argue frequently.

S.W. testified that she did not want to report the abuse to the police because the [petitioner] was paying her eight hundred dollars per month for child support and that she was worried he would not be able to pay her if he went to jail. She said she may have sent a text message to the [petitioner] stating, "[W]hy are you ignoring me?" However, she did not remember if or when she sent the message. She acknowledged sending another message that stated, "[Y]ou will regret this." However, she said, "I can't tell you what [the message] was about." The controlled telephone call was made to the [petitioner] at work. S.W. acknowledged that she continued to have a sexual relationship with him after they separated in January 2010. She said she and the [petitioner] still loved each other after they separated and had sex as late as October 2010. She denied using the victim's allegations to force the [petitioner] to do what she wanted, including paying child support.

8

On redirect examination, S.W. testified that after the [petitioner] moved out of their home in January 2010, they maintained a very close relationship. On the day of the [petitioner]'s arrest in December 2010, he telephoned her fifteen times from jail. The [petitioner] was not angry with her and never accused her of trying to get money from him.

Travis Belcher testified that in the fall of 2004, he and the [petitioner] were roommates and good friends. They shared a two bedroom apartment in Preston Run Apartments. Belcher's children would visit him at the apartment one weekend, and the [petitioner]'s children would visit the [petitioner] the following weekend. A pull-out sofa was in the living room, and Belcher's children slept on it when they visited. The [petitioner]'s children always slept in his bedroom.

Samantha Searcy testified that her daughter, Brittany Kuntz, was good friends with the victim and that Searcy knew the victim's parents through the girls' friendship. One day, Kuntz received a telephone call from the victim. Kuntz told Searcy they had to pick up the victim because the [petitioner] had "beat her" and the victim could not contact her mother. Searcy went alone to the victim's house. The victim was sitting on the front steps and was crying. The [petitioner] came to the door and allowed the victim to leave with Searcy. Searcy and the victim returned to Searcy's home, and the victim showed Searcy red marks on her arms, legs, and back. The victim and Kuntz went into Kuntz's bedroom for a while. Then Kuntz told Searcy that the victim had something to tell her. Searcy went into Kuntz's bedroom, and the victim, who was shaking, nervous, and crying, told Searcy that the [petitioner] had been molesting her. Searcy said the victim told her "some very specific things that he had done to her," including that the [petitioner] had "fingered her while she was in her bed at night, that he would come into her room." Searcy spoke with the victim's mother and told her what the victim had said. Later that day, the victim's parents arrived at Searcy's house and talked with Searcy and her husband. Searcy told the victim's parent that she did not "feel good" about the victim's returning home with them. Searcy wanted to report the victim's allegations to the police but did not because the victim was scared and asked her not to report the allegations. Searcy said the victim's parents "wanted to handle it as a family unit."

On cross-examination, Searcy testified that when she went to pick up the victim, the [petitioner] was calm. The victim told Searcy that the [petitioner] had sexually abused her in her bedroom while she was sleeping.

Detective Sergeant Patrick Brady of the White House Police Department testified that he began investigating the case in August 2010 and met with the victim's mother, S.W. A few days later, Sergeant Brady and S.W. made a controlled telephone call to the [petitioner]. The State played an audio recording of the call for the jury. During the call, the [petitioner] said he touched the victim's vagina "on the top" but denied penetrating the victim. Sergeant Brady said that he did not interview the victim because it was standard protocol in sexual abuse cases for juvenile victims to be interviewed by someone from the Child Advocacy Center. Sergeant Brady also never interviewed the [petitioner].

At the conclusion of Sergeant Brady's testimony, the State rested its case and moved that counts 3 and 4 be dismissed. The trial court granted the motion. Regarding count 1, the State made an election of offenses reflecting that the aggravated sexual battery was based on the alleged incident in which the [petitioner] washed his hands. Regarding count 2, the State made an election of offenses reflecting that the aggravated sexual battery was based on the alleged incident in which the victim rolled away from the [petitioner] to make the touching stop.

Cicilly Dixon a DCS Child Protective Services investigator testified for the [petitioner] that she investigated the victim's case and interviewed the victim's mother. Dixon acknowledged that the victim's mother said the victim was going through a "lying phase" in 2008. The victim's mother also told another DCS employee that the victim had claimed digital penetration. S.W. never told Dixon that the penetration did not occur.

Heather Hesson testified that she babysat the victim and her brother in the summer of 2004. Hesson babysat the children Monday through Friday and got to see the victim interact with the [petitioner]. Hesson never saw the [petitioner] act in a threatening manner toward the victim. She said that the victim did not seem afraid of the [petitioner] and that they appeared to have a typical father/daughter relationship. On cross-examination, Hesson acknowledged that the victim's parents were still living together in 2004 when she babysat the children.

Rocky Isabell testified that he began working with the [petitioner] about eight years before trial and that they were good friends in 2004. Isabell visited the [petitioner]'s apartment while the [petitioner] was separated from S.W. and saw the [petitioner] discipline the victim. Isabell did not see the [petitioner] spank the victim or act in a mean or hateful manner toward her. The victim never acted afraid of the [petitioner].

The then thirty-seven-year-old [petitioner] testified that he worked on heaters and air conditioners prior to his arrest in this case. When the victim was young, the [petitioner] babysat her during the day while S.W. worked as a waitress. He said that the victim got diaper rash "quite a bit" and that he and S.W. applied medication to her vaginal area. When the victim got older, S.W. worked many hours each day, so the [petitioner] kept the victim and Z.W. The [petitioner] acknowledged that he ended up as the children's main disciplinarian but said that he was not physically abusive to the victim and never threw a cellular telephone at her. He acknowledged that he spanked the victim with a paint stick but said that he did not leave bruises on her.

The [petitioner] testified that one time when the victim was thirteen years old, he spanked her, causing welts on her legs and buttocks. He acknowledged that the spanking was "harsh." Samantha Searcy arrived at the [petitioner]'s home, and the [petitioner] allowed the victim to leave with her. Later, the [petitioner] received a telephone call from S.W., who told him that the victim was claiming he touched her a couple of years ago. The [petitioner] and S.W. went to Searcy's house. That night, they returned home with the victim. He said that he and S.W. tried to talk with the victim about her allegations but that the victim was upset and "wasn't saying much." The victim and S.W. went into the bathroom to talk while the [petitioner] watched television in the bedroom. He did not try to interfere with their conversation. The next day, S.W. left for a business trip. While she was gone, the [petitioner] and the victim discussed the victim's allegations. The [petitioner] knew the victim's allegations were untrue and told her that he could get into trouble. The victim told the [petitioner] that she wanted to call S.W. and tell S.W. that she had lied. The [petitioner] did not stand over the victim while she made the call.

The [petitioner] testified that although the victim recanted her allegations, S.W. continued to bring them up. The [petitioner] said he

11

would tell S.W. that the only time he touched the victim was "to medicate her." One day in January 2010, the [petitioner] and S.W. had a terrible argument. The next day, the [petitioner] and S.W. mutually decided to separate. The [petitioner] said that at some point, S.W. told him that the victim's allegations of sexual abuse had "come up again" and that "if you do this, this, and this, then I won't report it." The [petitioner] agreed to pay S.W. $830 per month for child support. However, S.W. was making more money than the [petitioner], and he told her in June or July 2010 that he was going to have to reduce the amount. He was also dating women, and S.W. expressed jealousy. The [petitioner] said that S.W. would bring up reporting the victim's allegations, that she would ask him to do things, and that she would be "hard to get along with" if he did not do them. In August 2010, the [petitioner] received a text message from her stating, "'You will regret this.'" Four days later, he received the controlled call. At the time of the call, the [petitioner] was working inside a school air conditioning unit and was having trouble hearing. He said that when he told S.W. during the call that he touched the victim, he was referring to the medication he put on the victim as a child. He had told S.W. about the medication many times before. He said he did not specifically mention the medication during the controlled call because he was busy working and assumed S.W. knew what he was talking about. On the day of the [petitioner]'s arrest, he telephoned S.W. because he wanted to see their children.

On cross-examination, the [petitioner] acknowledged that the victim was fabricating her sexual abuse allegations. The victim told the [petitioner] that she wanted a cellular telephone because most of her friends had phones, so the [petitioner] got her a phone for Christmas. He acknowledged that after he and S.W. separated in January 2010, he agreed to get counseling and stay away from women with children. However, he said that he was "just trying to appease" S.W. because he was scared and because S.W. wanted child support and "other things." He acknowledged that in a prior proceeding, he stated that S.W. did not threaten him over child support. He also acknowledged that although S.W. made false allegations against him, he continued to have a sexual relationship with her. S.W. sent a text message to the [petitioner] saying that "you will regret this" because she had been "texting" him and he would not respond to her. On the day of his arrest, the [petitioner] telephoned S.W. and was nice to her because he wanted her to bring their children to see him.

12

Brittany Kuntz testified for the [petitioner] that the victim revealed to her the [petitioner]'s sexual abuse. The victim told Kuntz that the [petitioner] touched her in her bedroom.

Kyle Marquardt testified for the [petitioner] as an expert in the determination and calculation of child support. He stated that was employed by Child Support Services PSI, a subcontractor for the Department of Human Services to establish paternity, determine support, and pursue people not paying support. In cases such as this one, where the mother's annual income was $90,000 per year and the father's income was $70,000, the parents' sharing custody would have resulted in the mother's paying child support to the father. If the mother had primary custody, the father would have paid the mother $800 to $900 per month for two children.

*State v. David Wooten*, 2013 WL at *1-10.

*Post Conviction Hearing*

Initially, we note that Petitioner was also tried in Robertson County for similar offenses against the victim. He was ultimately convicted of lesser-included misdemeanor offenses in that case.

Rocky Isabell testified that he had known Petitioner for twelve years through his work with Petitioner at Nashville Machine. He was called to testify on Petitioner's behalf at trial. Mr. Isabell testified that Petitioner shared an apartment with Travis Belcher. Mr. Isabell visited the apartment at least three times a week for four or five hours at a time during the period of time that Petitioner and Mr. Belcher lived together. He said that Petitioner and Mr. Belcher usually had their children at the apartment on the same weekends. Petitioner's children slept in Petitioner's bedroom, and Mr. Belcher's children slept on a "pull-out sofa." Mr. Isabell testified that Petitioner's attorney never asked him about any of those facts at trial. On cross-examination, Mr. Isabell was not aware that Mr. Belcher corroborated his post-conviction testimony at Petitioner's trial.

Trial counsel testified that the theory of defense in Petitioner's case was that the "charges were false or manufactured" by the victim. He further testified:

Because the first instance as I recall was - - the first time she made an allegation the theory was that it was in response to some discipline [Petitioner] administered. Then she recanted that allegation. No charges

13

were brought at that time. It wasn't even reported to the authorities. But then later on when she reinitiated the allegations [Petitioner] and his wife were going through a very rough period. They had a very bad argument where [Petitioner] said some very mean things to his then wife, which [the victim] overheard, so that - - and then ultimately the parties moved to divorce. And so the theory was that [the victim] was basically siding with her mother, was angry at her father for what he had said to her in that argument. And therefore when she went to her mother and said, well, before when I said I lied it was actually true. So the theory was that it was still false, but she was bringing it because she was trying to side with her mother in the - - in the separation.

Trial counsel testified that there was no physical proof in Petitioner's case, and there were no eyewitnesses to the allegations.

Trial counsel testified that Petitioner's Robertson County trial occurred first. He said that the State called Petitioner's father-in-law, Mark Brant, to testify at the trial. Mr. Brant testified about a family gathering at the "Searcy" residence after the allegations were made against Petitioner. He said that Petitioner called him to the gathering. Mr. Brant heard the allegations made against Petitioner at the family meeting but he did not report them to anyone. Trial counsel testified that Mr. Brant also indicated that Petitioner probably felt that Mr. Brant would be more loyal to Petitioner than the victim because the victim had been "going through some rough times" and having "some severe or significant/severe rebellious or discipline problems at the time." Trial counsel also agreed that Petitioner had not attempted to shield Mr. Brant from the victim. He felt that Mr. Brant's testimony supported Petitioner's credibility "to some extent." Trial counsel pointed out in closing argument that Petitioner brought Mr. Brant into the situation instead of hiding it from him and hoping the victim would not say anything.

Trial counsel testified that he did not call Mr. Brant to testify as a witness in Petitioner's Davidson County trial. He noted that the State called Mr. Brant as a witness at the first trial in Robertson County. Concerning the decision not to call Mr. Brant to testify at the Davidson County trial, trial counsel testified:

And then we developed that other information on cross. But after the Robertson County case, which did result in basically an acquittal - - or [Petitioner] was found guilty of a simple assault, I believe, or misdemeanor child abuse maybe, I don't recall. In any manner the verdict resulted in a misdemeanor lesser offense. But after that trial and gearing up and preparing for this case here in this county I did consider whether I wanted to call Mr. Brant. And I ultimately decided against it

14

despite this other favorable testimony. The reason was the Robertson County case, there was no one on the State's side of that case. Not [the victim], not her mother, there was no one that in my view was a sympathetic witness to the jury. [The victim] came across as a spoiled teenager that in my view a jury could easily believe would make a lie because she wasn't getting her way. [The victim's] mother, [Petitioner's] wife, came across as a vindictive, dysfunctional - - vindictive - - I'm struggling for another term, but the whole relationship was very obviously dysfunctional between [Petitioner] and his wife. And just overall she was not a sympathetic witness for the State. She in my view came across as a woman who would either encourage or support or foster a false allegation. She just was not sympathetic. The only witness in the entire case that in my view was a sympathetic witness, someone who the jury would identify with and find to be credible, was Mr. Brant. He played it straight down the middle. He had a good demeanor about himself. He was a pastor or former pastor. And he was clearly - - in politics they always use this word. Just the optics - - well, let me back up. He was clearly aligned - - by the time this case came to trial in both counties he was clearly aligned with [the victim's] situation. And although he played it straight down the middle as a witness and just told the truth the optics of it was that he was clearly aligned with [the victim]. And if anyone would have asked him that or been allowed to ask that he would have said, well, I believe [the victim]. And I had to struggle against that coming out. You know, I had to guard against that being blurted out or it being improperly asked by the State. And the State tried very hard in the Robertson County case to be allowed to ask Mr. Brant his opinion about [the victim's] character. And I was able to keep that from being asked. I was therefore concerned not only just about the general optics that he was a pretty credible, believable witness and him being aligned with the other party, but I was concerned about whether Judge Blackburn would make a different decision and allow Mr. Brant to testify as to [the victim's] general character. I don't think that would have been the correct decision, but I was worried the judge - - I know judges often make rulings I don't think they should. So I was concerned about Judge Blackburn allowing Mr. Brant to testify that in his opinion that [the victim] is a truthful, credible witness despite her problems years ago. So those were my decisions why I did not call Mr. Brant despite this other favorable testimony.

Trial counsel believed that Mr. Brant testified truthfully during the Robertson County trial. Mr. Brant's testimony was that Petitioner called him to a meeting about the

15

victim's allegations against Petitioner and that Petitioner did not "run from it." Mr. Brant did not report any of the allegations after the family meeting.

Trial counsel testified that two of the victim's former babysitters were called to testify at the Robertson County trial: Becky Cassinova and Heather Hesson (Ms. Hesson's last name is spelled "Heston" in the transcript of Petitioner's Robertson County trial). The transcript of Petitioner's Robertson County trial shows that Ms. Cassinova testified that she knew the Petitioner and his wife, and she babysat Petitioner's children, including the victim, at her home during the summer of 2005, after the timeframe of the allegations against Petitioner. Ms. Cassinova testified that Petitioner usually brought the children in the mornings and picked them up in the afternoons. She described Petitioner's interaction with the victim as "just normal." Ms. Cassinova noted that the victim would be indifferent when Petitioner arrived in the afternoons to pick her up.

The transcript from Petitioner's Robertson County trial also shows that Ms. Hesson testified that she babysat Petitioner's children, including the victim, from May until September of 2004, before and during a portion of the timeframe of the allegations against Petitioner. She thought that the victim was nine or ten years old at the time. Ms. Hesson babysat the children at the family's apartment in Hendersonville. She described Petitioner's relationship with the victim as "an appropriate father/daughter relationship. She was happy to see her father." Ms. Hesson testified that the victim did not show any "physical apprehension" toward Petitioner.

Trial counsel testified that he called Ms. Hesson to testify at Petitioner's Davidson County trial. Trial counsel said that during the Davidson County trial, he realized that he may have called the wrong babysitter to testify as Ms. Hesson had been the victim's babysitter before the allegations against Petitioner occurred. Specifically, trial counsel testified:

> Of course, we had different time frames for the Robertson County allegations and the Davidson County allegations. And so we had baby-sitters that had baby-sat for the kids. And so we had called in the Robertson County case one or more of the baby-sitters just to testify, you know, that they didn't see anything unusual in the interaction between [the victim] and [Petitioner]. And so we did - - or attempted to do the same thing in Nashville. But what I had done was I had gotten the time frames mixed up with the baby-sitters as to who baby-sat when. And as the transcript bears out, the baby-sitter we called had baby-sat before, I believe, any of the allegations regarding sexual contact had occurred.

16

Therefore, it was trial counsel's opinion that there would have been no reason for the victim to act unusual while in Ms. Hesson's care. Trial counsel agreed that during the Davidson County trial, Ms. Hesson testified that she had degrees in child development and family development relationships. She was asked by the State whether it would be unusual for the victim's behavior toward the offending parent to change after the sexual abuse began. Ms. Hesson testified that it would not be unusual. Trial counsel acknowledged that the defense theory was that the victim was going through a rebellious phase and fabricated the allegations against Petitioner. He testified that Ms. Hesson's testimony contradicted the defense theory "to a very minor degree." Trial counsel further testified that Ms. Hesson's testimony was not "significant testimony," and he did not "believe it made a difference one way or the other." He also noted that Ms. Hesson's testimony was not considered expert testimony.

Trial counsel testified that Travis Belcher testified at the Robertson County trial, and his testimony contradicted that of Petitioner concerning the sleeping arrangements at the apartment that Petitioner shared with Mr. Belcher. Trial counsel did not recall any discussions with Petitioner about whether Rocky Isabell's testimony would corroborate or refute Mr. Belcher's testimony that there were other sleeping arrangements at the apartment for Petitioner's children and that Mr. Belcher and Petitioner had their children at the apartment on opposite weekends.

On cross-examination, trial counsel estimated that he had handled more than 175 jury trials, and approximately twenty-five to fifty of those cases were child sexual abuse cases. He was also a "certified criminal trial specialist." Trial counsel successfully tried Petitioner's case in Robertson County for similar allegations as those in the present case. He testified that he planned to use the same strategy in Petitioner's Davidson County trial. He said:

> Which, I mean, I - - I wish I could have changed strategies because - - I mean, I knew the State would have the benefit of the transcripts from Robertson County, and I knew that they would make effects to plug the hole so to speak, which this hasn't been said and I haven't been directly asked it but I think it should be part of the record is I think the difference between the two cases is just the two main witnesses, [the victim] and her mother. One of the failings for the State in the Robertson County case was just the demeanor. And as I testified earlier, they were not sympathetic, appeared spoiled and vindictive, just the general demeanor on how they answered questions and how they carried themselves. It was night and day. So somebody told them how to testify. I'm not saying anything improper was done, but they cleaned up their act. And I suspect - - I was suspicious that was going to happen. But, you know,

17

we committed to the theory, we couldn't change it. There were no facts to change it.

*Analysis*

Petitioner contends that his trial counsel provided ineffective assistance because trial counsel failed to adequately cross-examine Mr. Isabell at trial, and he failed to call Mr. Brant and Ms. Cassinova to testify. We disagree.

In a post-conviction proceeding, the burden is on the Petitioner to prove his facts for relief by clear and convincing evidence. T.C.A. § 40-30-110(f); *see Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. *Id*. Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. *Id*. at 457.

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 205, 280 L. Ed. 2d 674 (1984); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." *Id*. at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter*, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id*. at 370 (quoting *Strickland*, 466 U.S. at 694). In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State*, 629

18

S.W.2d 4, 9 (Tenn.1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time. *Id.* at 690, 104 S.Ct. at 2066.

Following the evidentiary hearing, in a written order denying relief, the post-conviction court concluded that Petitioner had failed to prove that trial counsel's performance was deficient or that Petitioner was prejudiced by any alleged deficiency.

Concerning Petitioner's claim that trial counsel erred by not calling Becky Cassinova as a witness at the Davidson County trial, we first point out that it is well settled that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Neither the post-conviction court nor the reviewing court may speculate on "what a witness's testimony might have been if introduced by defense counsel." *Id.* Although Ms. Cassinova did not testify at the post-conviction hearing, the trial court considered her testimony during the Robertson County trial. The trial court held:

> As reflected in the Davidson County transcript and testified to by Trial Counsel, Heather Hesson was called as a defense witness at trial. . . . Trial Counsel admitted during the evidentiary hearing that he had some concerns that he may have called the wrong babysitter, noting that the Robertson and Davidson County allegations involved different time frames. As reflected in the transcript, although [sic] Ms. Hesson's babysitting occurred during part of the time period alleged in the Davidson County indictment, but only when Petitioner and his wife were living together. Trial Counsel testified, however, that he did not recall Ms. Hesson making any "damaging" statements at trial or any significant issues requiring a curative instruction request. Having reviewed the transcript, this Court agrees. Ms. [Hesson's] direct testimony essentially mirrors that of her Robertson County testimony. During cross-examination, the Court limited the State's questioning after bench conference resulting from Trial Counsel's objection. . . . While Ms. [Hesson's] testimony did not necessarily benefit the Petitioner, Petitioner has not demonstrated by clear and convincing evidence that her testimony caused any prejudice. Further, Petitioner has not met his burden that Trial Counsel was ineffective for failing to call Ms. Cassinova or that Petitioner was prejudiced by Ms. Cassinova not testifying at his Davidson County trial; that is, having reviewed Ms. Cassinova's Robertson County testimony, the Court finds that Petitioner

19

has not demonstrated that a reasonable probability exits that, but for counsel's deficient performance, the result of the proceeding would have been different, particularly in light of Petitioner's statements made during the controlled call. Petitioner's post-conviction request is denied as to this claim.

The record does not preponderate against the trial court's findings and conclusions concerning this issue. Although trial counsel thought that he may have called the wrong babysitter to testify at trial in the Davidson County case, he testified that her testimony was not "significant testimony", and he did not believe that it made a difference at trial "one way or the other." We note that neither Ms. Cassinova nor Ms. Hesson babysat the victim during all of the time period of the events listed in the indictment, although Ms. Hesson did watch the victim during a portion of the timeframe. Both women testified during Petitioner's Robertson County trial that they did not notice anything inappropriate between Petitioner and the victim. At Petitioner's Davidson County trial, Ms. Hesson testified that Petitioner and the victim had a typical father-daughter relationship, and the victim did not appear apprehensive of him. Her testimony covered a period of time listed in the indictments as to when the offenses occurred. Petitioner has not proven this claim by clear and convincing evidence.

Next Petitioner contends that trial counsel erred by not calling Mark Brant, the victim's grandfather, who had testified for the State at Petitioner's Robertson County trial. Again, Petitioner did not call Mr. Brant to testify at the post-conviction hearing and relied on Mr. Brant's testimony from the Robertson County trial. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Concerning Mr. Brant, the trial court made the following findings:

> The Robertson County trial transcript speaks for itself. Specifically, on direct examination, Mr. Brant testified that Petitioner disclosed [the victim's] allegations against him to Mr. Brant, and they all met to have a family meeting. [ ]. [The victim] did not speak at this particular meeting, and the matter was not discussed until sometime later. [ ] Mr. Brant then became aware of an argument between Petitioner and his wife described by the State as a "knock-down, drag-out fight" that occurred in 2010 on Martin Luther King holiday weekend. [ ] The summer thereafter, he and his wife spent time with [the victim] while taking her on a genealogical tour. [ ] The State attempted to inquire about Mr. Brant's opinion of [the victim's] trustworthiness and whether [the victim] discussed the allegations against Petitioner, but trial counsel's objections were sustained by the court. [ ]

20

On cross-examination, Trial Counsel elicited testimony from Mr. Brant that "at the time" of the disclosure, *Petitioner may have thought* Mr. Brant's loyalty lied more towards him than [the victim], [  ], but Mr. Brant ultimately stated that his loyalty at the time did not lean towards either his daughter, Sharon, or Petitioner, [ ]  When asked to explain his answer, Mr. Brant noted that, "[the victim] was going through a particularly difficult time," when Petitioner called Mr. Brant to let him know about the allegations, but he did not provide any details.  [  ]

The Court sustained Trial Counsel's objection to the one question the State asked on redirect:  "[Trial counsel] asked you about why you thought [the victim] - - [Petitioner] would think that you[r] loyalty would be with him over [the victim] and you said because of the opinion that you had of [the victim] at that time; do you still have that same opinion now?"  [ ]

Trial Counsel testified that although he elicited "some useful" testimony from Mr. Brant during the Robertson County trial, he elected not to call Mr. Brant at the Davidson County trial because Mr. Brant had been a State's witness and it was clear that as the case progressed that Mr. Brant's loyalty leaned towards his daughter and the victim, L.W., making him a less favorable witness at the subsequent trial.

This Court finds Trial Counsel's testimony credible and exhibited an informed strategic decision.  Accordingly, the Court denies post-conviction relief as to this claim.  *Adkins*, 911 S.W.2d at 347; *Cooper*, 847 S.W.2d at 528.

The record does not preponderate against the trial court's findings as to this claim. Trial counsel testified that he made a strategic decision not to call Mr. Brant as a witness at the Davidson County trial.  Mr. Brant had been the State's witness at the Robertson County trial, and trial counsel considered calling him as a defense witness at the Davidson County trial because his testimony was somewhat favorable to the defense. However, trial counsel ultimately decided against calling Mr. Brant.  Trial counsel noted that during the first trial, neither the victim nor her mother were very sympathetic witnesses because the victim came across to the jury as a spoiled teenager, and her mother seemed vindictive.  He thought that the only witness who seemed sympathetic and credible was Mr. Brant.  Trial counsel testified that Mr. Brant "played it straight down the middle," and he "had a good demeanor about himself."  Trial counsel testified that when it came time for both trials, Mr. Brant was "clearly aligned" with the victim's situation.  He felt that if anyone asked Mr. Brant if he believed the victim, trial counsel

21

believed that Mr. Brant would have said yes.  Trial counsel noted that during the Robertson County trial, he had to "guard against that being blurted out or being improperly asked by the State."  He said, "And the State tried very hard in the Robertson County case to be allowed to ask Mr. Brant his opinion about [the victim's] character."  Trial counsel feared that the trial court in the Davidson County case might allow Mr. Brant to testify concerning the victim's character and that she was a "truthful, credible witness despite her problems years ago."

We conclude that the post-conviction court properly found that trial counsel made a sound strategic decision not to call Mr. Brant as a witness, and this court will not second-guess trial counsel's decision regarding this issue.  *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn.1982).  Petitioner is not entitled to relief.

Finally, Petitioner argues that trial counsel failed to adequately question Rocky Isabell at trial to rebut Travis Belcher's testimony that he and Petitioner had their children at the apartment on alternating weekends and that the victim and her brother could have slept on a pull-out sofa rather than in the bedroom with Petitioner when they were at the apartment.  Concerning this issue, the trial court held:

> Mr. Isabell actually had been called as a defense witness at the Davidson County trial.  [    ]; *Wooten*, 2013 WL 4007784, at *8.  At that time, he testified that he had met Petitioner through work and had known him for 8 years.  [  ] The focus of his direct testimony concerned how Petitioner acted toward his daughter; specifically, that Mr. Isabell had not observed any inappropriate, threatening, or abusive behavior.  [   ] Mr. Isabell confirmed that he had spent the night at Petitioner's apartment previously and observed a pull-out couch.  [    ] At the post-conviction evidentiary hearing; however, Mr. Isabell testified, as summarized in Part III of this Order, about how often he visited the apartment, that Petitioner's children slept in Petitioner's room while Mr. Belcher's children slept on the pull-out couch, and that Petitioner had custody of his children on the same weekends as his roommate.  Mr. Isabell testified that he was present at trial, but that he was not present during Mr. Belcher's testimony.
>
> The primary purpose of Mr. Isabell's new testimony – the timing of which undermines its credibility – would be to establish that Petitioner and Petitioner's roommate, Mr. Belcher, had custody of their children simultaneously, necessitating the sleeping arrangements.  Mr. Isabell's testimony contradicting Mr. Belcher's testimony regarding custody of his own children is insufficient on its own to meet the clear and

convincing evidence standard. Moreover, Petitioner was present at his own trial and heard Mr. Belcher testify about the custody arrangements, and could have advised his counsel during the trial about the veracity of the statements, which if untrue, could have been addressed on cross-examination, by raising the issue during questioning of Mr. Isabell when he was called as a trial witness, and/or by introducing documentation of custody arrangements, etc. Petitioner did not testify at his post-conviction hearing to provide any proof about the veracity of Mr. Belcher's testimony. For all these reasons, the Court finds that Petitioner has not established that Trial Counsel was ineffective for failing to call Mr. Isabell to rebut Mr. Belcher's testimony or that Petitioner was prejudiced by any alleged deficiency. The Court reiterates that Petitioner still must overcome the statements made during the phone call. Petitioner's request for post-conviction relief is denied as to this claim.

The record does not preponderate against the trial court's findings concerning this claim. Trial counsel did not recall any conversations with Petitioner about whether Mr. Isabell's testimony would corroborate or refute Mr. Belcher's testimony that there were other sleeping arrangements at the apartment for Petitioner's children and that Mr. Belcher and Petitioner had their children at the apartment on opposite weekends. We also point out that during direct examination at the Davidson County trial, Mr. Belcher testified:

I remember when we had our kids together there one time, and we had some other people over. And they slept - - you know, a friend, Rocky Isabell, he slept there. And we had another friend that, you know, came, you know for a short time and stayed two or three nights, Keith Lambert (phonetic).

Therefore, there was testimony that Petitioner and Mr. Belcher's children were at the apartment at the same time on occasion when Mr. Isabell was present. Therefore, Petitioner has not proven this claim nor has he demonstrated that he was prejudiced by trial court's alleged failure to properly question Mr. Isabell at trial. As pointed out by the trial court, evidence at trial showed that during a recorded phone call, Petitioner admitted that he touched the victim's vagina "on the top" but denied penetrating her.

We also point out that trial counsel specifically testified that in his opinion, the difference between the outcome of Petitioner's two trials was the "two main witnesses, [the victim] and her mother." He felt that the demeanor of the two witnesses changed from the Robertson County trial to the Davidson County trial. Trial counsel testified:

23

And as I testified earlier, they were not sympathetic, appeared spoiled and vindictive, just the general demeanor on how they answered questions and how they carried themselves. It was night and day. So somebody told them how to testify. I'm not saying anything improper was done, but they cleaned up their act.

Petitioner has failed to establish that trial counsel provided ineffective assistance. For the foregoing reasons, the judgment of the post-conviction court is affirmed.


_____
THOMAS T. WOODALL, PRESIDING JUDGE